UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                              Plaintiff,<br><br>        v.<br><br>TERRY LOMAX,<br><br>                              Defendant. | Case No. 2:17-cr-00262-JAD-PAL<br><br>**REPORT OF FINDINGS AND<br>RECOMMENDATION**<br><br>(Mot. Suppress – ECF No. 15) |

    This matter is before the court on Defendant Terry Lomax's ("Lomax") Motion to Suppress Evidence and Statements from Illegal Stop and Seizure and all Evidence from the Illegal Seizure (ECF No. 15), filed December 22, 2017[1]. This Motion is referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(B) and LR IB 1-4 of the Local Rules of Practice. The court has considered the Motion, and the Government's Response (ECF No. 16). No reply was filed and the time for filing a response has expired. The court held oral argument on the motion requesting an evidentiary hearing on February 20, 2018. At the hearing, counsel for defense represented that Lomax intended to testify at an evidentiary hearing that he did not commit any traffic infractions prior to the stop which resulted in his arrest. The court therefore granted the request for an evidentiary hearing and set the matter for an evidentiary hearing on March 13, 2018 a date mutually convenient to both sides. An evidentiary hearing went forward as scheduled on March 13, 2018. Dan Winder and Scott Dorman appeared on behalf of Lomax. AUSA Frank Coumou appeared on behalf of the government.

---

[1] On February 20, 2018, counsel for Lomax filed another document entitled a Motion to Suppress Evidence and Statements (ECF No. 22). A notice of docket correction was entered by the clerk's office indicating that (ECF No. 22) was actually a corrected image to the Motion to Suppress (ECF No. 15).

## BACKGROUND

A federal grand jury returned an Indictment (ECF No. 1) on August 15, 2017, charging Lomax with one count of felon in possession of a firearm and ammunition in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). The indictment arises out of an arrest by Las Vegas Metropolitan Police Department ("LVMPD") officers on May 17, 2017.

I. THE PARTIES' POSITIONS

A. Defendant's Motion (ECF No. 15)

In the current motion, Lomax seeks to suppress evidence recovered and statements made following his seizure and arrest on May 17, 2017. Lomax argues that on the date of his arrest, he was operating his vehicle in a lawful and safe manner. He alleges that members of the LVMPD gang enforcement unit conducted a pretextual stop believing he was a gang member. This erroneous assumption was based on the fact that he was wearing a hat with the letter "T" prominently on it. Lomax claims he wears a hat with a "T" on it because is name is Terry. However, gang unit officers erroneously concluded that he was a member of the THN gang[2].

Lomax argues that an automobile stop and detention of an occupant constitutes a seizure within the meaning of the Fourth Amendment. His written motion maintains that courts have not always been clear whether a pretext stop is measured by an objective or subjective standard. Citing the Ninth Circuit cases of *United States v. Perez*, 337 F.3d 510, 513 (9th Cir. 1994) and *United States v. Millan*, 36 F.3d 886, 883 (9th Cir. 1994), Lomax asserts that courts have used both standards. Lomax maintains that the facts surrounding the stop in this case are strikingly similar to those the Ninth Circuit found violated the defendant's Fourth Amendment rights in *Millan*. Although the gang enforcement unit officers involved in the arrest say that Lomax conducted a number of traffic violations, Lomax's written motion disputes this. However, even if the court decides that Lomax committed some minor traffic offenses, he contends the test for determining whether the stop violated his Fourth Amendment rights, is whether the stop is one which a reasonable officer would have made absent an ulterior motive.

---

[2] The motion states that THN is an acronym for a gang called True Hard N-----.

Lomax claims that on the date of his arrest, he was an everyday citizen who was pulled over for a minor traffic violation and would not have been stopped absent a motive to investigate for more serious offenses, or possibly to gain intelligence for the gang unit. Cases in other jurisdictions have employed the "would have" test. Under this test, the Fourth Amendment issue is not determined by whether an actual traffic violation occurred. Lomax states that an evidentiary hearing will show that this stop was initiated by an LVMPD gang officer who has not issued citations for traffic violations, and did not pull Lomax over to issue a traffic citation. Because no reasonable officer would have made the stop absent an ulterior motive, Lomax believes an evidentiary hearing will establish that the stop was a pretext for investigating vague suspicions of other unlawful activity.

**B. The Government's Response (ECF No. 16)**

The government filed a Response (ECF No. 16) asserting that because the motion to suppress contained no statement of facts Lomax must be conceding the facts stated in the police report as true. The government opposed the request for an evidentiary hearing and supports its response to the motion to suppress by information provided in the police report and a bodycam video worn by one of the arresting officers, Officer Nameth. The police report and bodycam video were attached as Exhibits A and B to the government's response

The government maintains that on May 17, 2017, at approximately 8:03 p.m., LVMPD Officers Sowers and Nameth were patrolling in the area around Lake Mead Boulevard and J Street in a marked patrol vehicle. They were assigned to the gang enforcement unit. As the officers were traveling north on J Street waiting at a traffic light, they spotted a silver sedan with California license plates approaching from the rear of the patrol vehicle in the No. 2 lane. The officers observed that the silver car failed to stop at the intersection's white line, and instead rolled into the marked crosswalk. They then observed the car make a quick right turn heading east on Lake Mead while failing to activate a right turn blinker. The officers followed the silver sedan and attempted to position their marked patrol car behind it. While traveling on Lake Mead the officers observed the car engage in a lane change violation and failure to stop at the red light at Lake Mead and H Street, once again entering a crosswalk.

1          The officers decided to conduct a traffic stop just west of the intersection of Lake Mead

2    and D Street by activating their emergency lights and sirens signaling the driver to pull over.  The

3    driver moved over as if to stop, but suddenly accelerated.  The officers pursued and observed the

4    car drive through a red light at the intersection of Lake Mead and D Street.  For safety reasons, the

5    officers deactivated their emergency lights, but followed the silver car.  The officers watched the

6    car make a rapid southbound turn onto Gregory Street and go up the east sidewalk causing the left

7    tire to go flat.  The driver then made a westbound turn onto Elliot Avenue, abandoned the car, and

8    ran westbound on Elliot Avenue.  While running, the officers observed a person, later identified

9    as Lomax, holding an unknown object in his pants pocket.  The officers followed Lomax in their

10   patrol car until he ran south on Leona where he jumped into a fenced yard at 1964 Leona Street.

11   Officer Nameth jumped out and pursued Lomax on foot.  While on foot pursuit, Nameth watched

12   Lomax remove a black-framed handgun from his pocket and toss it.  Officer Nameth eventually

13   caught Lomax and placed him under arrest.  Officer Sours retraced Lomax's path and found a

14   black .40 caliber Glock handgun, Model 27, laying on the ground next to the front door of the

15   residence at 1964 Leona Street.  Several $100 bills totaling approximately $1,000.00 were also

16   recovered.

17          Shortly after his arrest, Lomax received and waived *Miranda* warnings.    After

18   acknowledging that he understood his rights and waived them, he admitted to possessing the

19   money, but denied possessing the handgun.

20          Officer Nameth was wearing a bodycam which captured the final moments of the police

21   car chase leading up to Lomax's arrest.  A copy of this bodycam was manually filed as Exhibit B

22   with the government's response.

23          The government argues that the officers properly conducted a traffic stop and had the legal

24   authority to give chase to Lomax after he abandoned his vehicle.  The government acknowledges

25   that the Fourth Amendment's prohibition against unreasonable searches and seizures is extended

26   to brief investigatory stops of persons or vehicles that fall short of a traditional arrest.  A temporary

27   detention for traffic violations is reasonable under the Fourth Amendment where officers have

28   probable cause to believe that a person stopped violated the traffic code, even if the ultimate charge

1    was not related to the traffic stop.  Subjective intentions of an officer play no role in ordinary

2    probable-cause Fourth Amendment analysis.  Therefore, if the officers have probable cause to

3    believe that a traffic violation occurred, the officers may conduct a traffic stop even if the stop

4    serves some other purpose.

5        In this case, the officers observed Lomax commit multiple traffic violations which gave

6    them probable cause to conduct a traffic stop.  Lomax decided to evade the police which elevated

7    the officers' probable cause to stop him.  Instead of complying with the officers' attempts to pull

8    him over, Lomax chose to race away from the police by accelerating through the red light at the

9    intersection of Lake Mead and D Street.  He continued to evade the police, drove a disabled car

10   with a flat tire onto Elliot where he abandoned it and ran away on foot.  While on foot pursuit,

11   Officer Nameth ordered Lomax to stop and warned him that he could be hit with a taser.  Thus,

12   Lomax's own actions give rise not only to reasonable suspicion that additional criminal activity

13   was on hand, but probable cause to arrest him for a misdemeanor offense.

14       The government disputes that the facts of *United States v. Millan* which Lomax cites in his

15   motion are strikingly similar.  Additionally, the *Millan* decision was rendered two years prior to

16   the United States Supreme Court's decision in *Whren v. United States*, 517 U.S. 806 (1996)

17   adopting an objective standard. The United States maintains that the police properly seized the

18   firearm and cash following the attempt to make a traffic stop and foot pursuit in this case.  All of

19   the cases that Lomax relies upon predate the United States Supreme Court decision in *Whren*.

20   Additionally, the United States cites *California v. Hodari D*, 499 U.S. 621 (1991) for the

21   proposition that Lomax was not seized for purposes of the Fourth Amendment until he was actually

22   taken into physical custody.  In this case, Lomax failed to pull over when the officers activated

23   their overhead emergency lights and siren.  Lomax refused to comply with commands to stop,

24   evaded officers, abandoned his disabled car, and continued to run from the police until he was

25   tackled in the backyard of the residence where he was eventually seized.

26       Finally, the government contends that the police properly obtained statements made by

27   Lomax after his arrest.  Officer Nameth read *Miranda* warnings to Lomax who appeared to

28   understand and complained about why he was being stopped.  Lomax asked the officers for his

money back following his arrest. Lomax was not being questioned by the police when he asked for his money which was an admission that the money was found next to the handgun was his. Thus, there is no legal basis to suppress his statement.

### C. Testimony at the Evidentiary Hearing

At the evidentiary hearing the government called Officers Nameth and Sowers to testify and then rested. Defense counsel called no witnesses, but asked to mark and admit two exhibits, a disc of the bodycam footage from other officers who responded to this call on the night of Lomax's arrest, and a Google map of the area of J Street and W. Lake Mead Boulevard. The government stipulated to the admission of both exhibits. The court canvassed Lomax concerning his understanding of his right to either testify or not. Lomax stated that he was aware that he had the right to testify if he so desired, but could not be compelled to testify if he did not wish to do so. Lomax told the court that after conferring with his counsel, he had decided not to testify.

### 1. Testimony of Officer Nameth

Officer Nameth has been employed by LVMPD for four years, and is currently assigned to the gang unit. On May 17, 2017, he was working the swing shift from 3 p.m. to 1 a.m. and assigned to the gang enforcement squad. His duties at that time were to go to violent areas and to be proactive, to talk to people who may intend to do harm to the community. He was a passenger in uniform in a marked patrol car driven by his partner, Officer Sowers. At the intersection of Lake Mead and J Street the officers were stopped at a red stop light when Nameth observed a vehicle that did not appear to want come up next to or pass the patrol car. The vehicle was driving in an unusual manner. Nameth recalled that a robbery call had just come out, so Nameth was on "extra alert". However, there was no description of the suspect. The driver's behavior was unusual because he was driving very slowly. When the vehicle got closer to the patrol car, it looked like a rental car. Nameth could not recall the exact make and model or color of the vehicle.

Nameth first observed the vehicle while looking in the mirror of the patrol car and through the passenger window. He did not know approximately how far away the vehicle was when he first observed it, but estimated it was probably 100 feet away approaching the turn lane in an unusually slow manner. It seemed the driver was "almost distracted or impaired."

1    Nameth tried to smile and wave at the driver. The vehicle stopped in the crosswalk and

2    the driver would not make eye contact with Nameth. Nameth observed the driver commit a

3    violation of the traffic code by stopping in the crosswalk. Once Nameth made eye contact with

4    the driver, the driver made a quick right-hand turn. Nameth was trying to read the license plate on

5    the vehicle. While doing so, he observed the driver make an unsafe lane change. He did not recall

6    the exact details and would have to refer to the arrest report to refresh his recollection. Upon

7    reviewing the report, he recalled that the vehicle was a silver sedan with California license plates

8    on it. Once the silver sedan made the right-hand turn eastbound, Nameth observed the driver

9    commit a "signal intention" violation. He described this as a failure to signal an intention to change

10   lanes. Nameth was concentrating on getting a records return on the license plate. The traffic was

11   heavy at the time. The patrol car followed the silver sedan. Sowers observed the vehicle while

12   Nameth was waiting for a hit on the license plate. He believed Sowers observed the vehicle run a

13   red light at H and Lake Mead.

14       Sowers said something and the officers prepared for a vehicle stop. The patrol car's lights

15   and sirens were activated. The driver of the sedan seemed to be pulling over like normal, but

16   didn't and kept on going. The driver accelerated very quickly eastbound on Lake Mead and went

17   through a red light at D Street. Nameth was concerned because of the time of day and because

18   there was a lot of traffic and people on the road. The situation was dangerous. Nameth focused

19   on the vehicle. He did not recall how long the lights and sirens remained on. LVMPD policy is

20   to not pursue with red lights and sirens on only traffic violations, so the lights and sirens were

21   turned off. Nameth lost sight of the vehicle over a hill, but barely saw it make a right-hand turn

22   on Gregory southbound. Nameth observed the back end of the silver sedan strike and slide onto

23   the sidewalk. He later learned the back tire was flat. The vehicle turned right on Elliot westbound

24   and stopped. Nameth observed the driver running from the vehicle westbound on the sidewalk.

25   Nameth and his partner went around the vehicle as Nameth was preparing for a foot pursuit. He

26   identified Lomax as the person who emerged from the vehicle in court.

27       Nameth observed Lomax take off sprinting. He saw that Lomax was wearing loose

28   clothing and grabbing at his waistband as if he was holding something in his pocket. Nameth was

concerned that he had a weapon.  Nameth told his partner that Lomax may have a gun.  The officers continued to follow Lomax's car until Nameth got out of the patrol car and began to chase Lomax on foot in front of a property at 1964 Leona Street.  Nameth observed Lomax jump over a fence at that address.  The property appeared completely surrounded by a fence or wall.  Nameth opened the gate and pursued Lomax repeatedly yelling at Lomax to stop.  Lomax did not comply and he pursued Lomax running around the house.  The residence was a small house and the two circled the residence twice.  Lomax's right hand was in his pocket.  Nameth observed Lomax drawing the frame of what appeared to be a firearm from his pocket.  As a result, Nameth drew his firearm and continued to run after Lomax.  Nameth was afraid Lomax was going to turn and use the firearm on him.  Nameth saw Lomax's body positioned at the door of the residence and was assessing a possible threat by looking at Lomax's chest area.  Nameth did not see the firearm at this point. Lomax began running again.  Nameth pursued Lomax to the west side of the house where Lomax gave up.  Nameth took Lomaz into custody.

Nameth heard the family inside the residence screaming.  He told Lomax he was going to use his taser if he did not give up.  Lomax gave up shortly after and put his hands up.  Nameth used a "modified takedown," holstered his taser and firearm, and handcuffed Lomax.  Nameth was worried about the firearm and asked Lomax where it was, but could not recall exactly what Lomax said.  Nameth escorted Lomax close to the front door of the residence and observed what appeared to be a Glock near the front door by a stool with money next to it.  The area was consistent to where Nameth saw Lomax ditch the gun.  Nameth kept hearing the family crying inside the home. Nameth took Lomax to the patrol car, read *Miranda* warnings to him from a standard LVMPD issued card verbatim.  Lomax acknowledged understanding his rights and "laid claim to the money" that was found next to the handgun.  Other officers arrived to assist.

On cross-examination, Nameth testified that he did not recall the time of the day or night when this incident occurred.  He believed it was daytime.  He reiterated that he first observed the silver sedan while stopped at the intersection of the traffic light at J and Lake Mead Boulevard. The driver of the vehicle appeared impaired or distracted.  Nameth did not see the driver until later.

He did not observe the driver weave.  The driver of the sedan appeared to be making an effort not to make eye contact.  It stopped in the crosswalk ahead of the patrol car.

Nameth identified Exhibit A as LVMPD's body-worn camera policy.  The bodycam he wore has a button that is pushed to begin recording.  When the button is pushed, the bodycam begins recording footage 30 seconds prior with no audio.

Nameth observed the driver of the vehicle commit a lane violation although he was focused on reading the plate at the time.  The violation was that the driver traveled too short a distance before making a lane change to signal his intention to change lanes.  Nameth could not recall seeing the driver's signal, but the violation was that the distance was too short for the lane change.  Therefore, whether or not the driver signaled would not matter.  A driver must travel 100 feet in advance after signaling an intention to change lanes.  Although Nameth had witnessed two traffic violations, he did not activate his bodycam camera because he was worrying about getting the license plate and receiving return information.

Although the officers initiated lights and sirens on the patrol car, Nameth denied that there was a vehicle pursuit that day, even after the driver of the sedan sped off.  He did not recall at what point the lights and siren were turned off.  He could not recall activating his bodycam while he remained in the patrol car.

Nameth's partner authored the arrest report he used on the witness stand to refresh his recollection.  The report does not state that the vehicle approached the stoplight as if impaired or distracted.  Nameth could not say at what exact time he hit the button on his bodycam to begin recording.  Nameth believed department policy on the use of bodycams during foot pursuits says to activate the camera when it is safe to do so.

On the date of the incident, he could not recall exactly what he said to Lomax about why he was pulled over.  He testified he could not recall "the exact narrative," but remembers saying something about a robbery.

Nameth was asked what THN means.  Nameth testified that it is an acronym for True Hard N-----, a Las Vegas gang.  Nameth does not regard himself as a gang expert although he is assigned to gang enforcement.  He could not recall the color of Lomax's hat.  He could not recall Lomax

9

1    saying that he was not a gang member, or he or his partner responding to Lomax "you got the hat
2    bro, you got the hat."

3          Nameth saw the gun next to a stool in front of the residence and also saw money next to
4    the firearm.  The money was closer than 20 feet, but he could not recall how far away the money
5    was from the gun.  While Nameth was chasing Lomas around the house, he observed Lomax within
6    18 inches of the chair.  He could not recall how the money was packaged, only that it was next to
7    the firearm.  He acknowledged that none of the traffic violations he observed were captured on his
8    bodycam.

9          On redirect, Nameth testified that, after refreshing his recollection from the arrest report,
10   he first made contact with Lomax at 20:03 or 8:03 p.m.  He was able to get the license plates on
11   the silver sedan and called it in.  The silver sedan had California plates and returned as a rental car.

12         At the time of this incident the bodycam was "kind of new".  Nameth did not have a
13   bodycam when he first went to the academy.  In volatile situations, he was having trouble with the
14   "fine motor skill" of pushing the button.  He eventually repositioned the button on his bodycam
15   and currently wears it on the front of his waist belt.  At the time of this incident, he was moving
16   the button on the bodycam around to try to find a place where it was accessible, trying to get better
17   at it.

18         Nameth reiterated that he observed the driver of the silver sedan commit a number of traffic
19   violations.  The car came to a stop at the intersection of J and Lake Mead, but stopped past the
20   marked line where vehicles are supposed to stop and entered into the crosswalk.  The driver made
21   a turn signal violation after making a right-hand turn on Lake Mead by turning from one lane to
22   another in less than 100 feet.  After Sowers activated the lights and sirens to pull the vehicle over,
23   the driver appeared to pull over and then accelerated which is also a moving violation.  The officers
24   deactivated the lights and sirens pursuant to department policy hoping the driving behavior would
25   change and that no one would be hurt.  Lights and sirens were deactivated for a safety reason.
26   Nameth turned on his bodycam after he got out of the patrol car.  He has reviewed the footage and
27   knows that the bodycam recorded the very end of the following the silver sedan.

28

In response to questions by the court Nameth acknowledged that the gang unit is a proactive unit that looks for minor violations to pull people over to check out the situation. He believed he noticed the "T" on Lomax's hat before Lomax was pulled over, but denied he pulled Lomax over because he thought Lomas was potentially a member of a gang. Nameth was "worried about the rental car and the robbery."

### 2. Testimony of Officer Sowers

Officer Sowers has been employed by LVMPD for three years. On May 17, 2017, he was on duty and assigned to the gang enforcement unit. The gang enforcement unit was dispatched to local hot spots where there has been a lot of violent crime. The gang unit conducts proactive stops throughout the area. He was in a marked car and in uniform. His duties included enforcing all laws.

At approximately 8:00 p.m., he was stopped at the stop light at J and Lake Mead. Sowers was the driver and his partner Nameth was in the passenger seat. It was just beginning to get dark at that time. Sowers was trained to stay alert in the car because "nowadays it's very common that police officers will be ambushed in their cars because it's considered a weak point." If a vehicle approached the intersection from the rear of the patrol car. It was a silver Ford sedan. After refreshing his recollection with his arrest report, he testified the car was a silver Chevy Malibu with California license plates on it. His attention was called to the vehicle because, instead of proceeding by the patrol car in a normal pace, the driver rolled slowly behind the patrol car. The silver sedan eventually passed the patrol car side by side, came up to a marked white line, and partially obstructed the crosswalk. This is a violation of the traffic code for failure to stop behind the white line and entering the crosswalk obstructing it. The driver made a right-hand turn without signaling, which was another violation of the traffic code because another vehicle was behind it.

Sowers and Nameth decided to follow the vehicle because of the traffic violation and Sowers observed the driver of the sedan change from the No. 2 to the No. 3 lane. The driver used his blinker, but changed lanes without traveling 100 feet as required by the traffic code. Another vehicle in the No. 2 lane was affected by the driver's maneuver.

Sowers maintained visual on the driver of the sedan and observed it approach a red light on Lake Mead and H Street. The driver of the silver sedan made the same violations previously observed, that is, he rolled across the white line where vehicles are supposed to stop and obstructed the crosswalk. Sowers thought the driver of the sedan was distracted or impaired or trying to avoid the officers.

Sowers decided to position himself behind the silver sedan and conduct a traffic stop. The patrol car went through the light at H and Lake Mead and Sowers activated the lights and sirens. The silver sedan began to pull to the right side properly and got to the right shoulder with the patrol car behind. The sedan then immediately went into the traffic lane and accelerated excessively, *i.e.*, faster than normal. Sowers maintained the lights and sirens on the patrol vehicle for a short time. However, because only traffic violations were observed and it's against department policy to pursue for traffic violations, he deactivated them. Sowers pursued the vehicle and called for other officers to assist. It was a traffic violation for the driver of the vehicle to fail to come to a complete stop when the officers signaled him to pull over.

While following the sedan, Sowers observed another violation when the car failed to stop and ran a red light between at D and Lake Mead. The driver of the sedan nearly caused an accident. Sowers stopped the patrol car at the red light, but kept visual contact on the sedan. When the light turned green, the patrol car proceeded through the intersection and observed the sedan southbound on a neighborhood side street at Gregory. Sowers gunned his patrol car to catch up and observed the driver of the sedan hit the sidewalk on Gregory and come back on the street. It appeared that one of the tires on the sedan went flat after hitting the curb. The vehicle slowed down and made another right-hand turn and stopped. Sowers watched the driver of the sedan get out and run westbound on Elliot at a full sprint. He identified Lomax as the driver in court.

Sowers was able to get close to the driver. While Lomax was running, Sowers saw his right hand on his right pocket/waistband area as if holding something in his pocket. Sowers is trained to always maintain visual on hands because of the possibility the hands are holding a weapon. Lomax was westbound on Elliot and tuned left on Leona Street heading southbound. At 1964 Leona, Lomax jumped a gate into the front yard of the residence. Nameth got out of the

patrol car and began to chase Lomax.  Sowers stayed in the patrol car, did a u-turn and tried to cut Lomax off by driving eastbound.  Nameth eventually apprehended Lomax.  Sowers showed up immediately after Nameth had Lomax in custody.  Sowers observed Nameth chase Lomax around the south side of the residence, and Sowers positioned his car to the east in the direction where Lomax was running.  Sowers heard Nameth yelling and saw Nameth and Lomax in the backyard of the residence.

After Lomax was apprehended, Nameth told Sowers he believed Lomax had thrown a weapon on the north side of the residence.  Sowers retraced Lomax's steps during the chase back to the north side of the residence.  Near the front door next to a chair, he found a black Glock firearm.  There was money in the immediate vicinity of the firearm, *i.e.*, within a few feet.  He did not recall the exact amount of the money that was recovered.

Once Sowers located the firearm, he stayed with it.  He did not recall whether he was present when *Miranda* warnings were read to Lomax or whether Lomax claimed the money that was found was his.

Sowers had a bodycam for approximately six to eight months before this incident.  He was not sure when exactly he turned on his bodycam.  He would typically activate the bodycam once he got out of the car during a stop.  He usually keeps the button for his bodycam in his left pocket. It would be difficult to activate his bodycam while driving and seated.

On cross-examination, Sowers testified that Nameth alerted him to the vehicle approaching on the side and behind the patrol car.  Sowers was concerned about the vehicle because of the way it was driving.  There was no vehicle in front of the silver sedan preventing it from moving forward. However, the driver rolled up slowly even though no cars were in front approaching the side of the patrol car.  Sowers acknowledged that the driver could legally turn right on red, but still needed to stop at the white line first.  The driver did not do so and entered the crosswalk.  Sowers could not recall if there was anyone in the crosswalk at the time.  The patrol car got behind the driver in the silver sedan in the right lane immediately after the driver turned right at J and Lake Mead.  The driver was driving at a normal speed.

Sowers has been with LVMPD approximately three years.  He could not recall the number of citations he has written for a crosswalk violation.  He did not recall whether the driver of the silver sedan was wearing a hat with a red letter "T" or what the driver was wearing.

He could not recall when, but at some point Sowers reviewed the bodycam footage for this incident.  He did not recall if the bodycam footage shows any of the traffic violation. He testified that he was aware that the department policy says the bodycam should be activated in a traffic stop.  However, the policy directs that the bodycam should be activated when it is safe and practical to do so.

After observing several traffic violations, Sowers and his partner intended to stop the vehicle, but made the decision to stop the vehicle between H and D Streets when lights and sirens were activated.  He could not recall hearing Nameth say that part of the reason that Lomax was stopped was because of a shooting or robbery in the area.  He could not recall if there was such a call on that day.  Nameth told Sowers to watch the car to the right which is the first time Sowers observed it.  Sowers then observed the vehicle committing traffic violations.

Sowers could not recall conversation after Lomax was in custody to the effect that an officer on scene told Lomax you know this is a violent area, or that Nameth stated officers were aware of a robbery or shots fired call.  Sowers could not recall officers telling Lomax "we're the gang unit, be cool," or Nameth commenting that Lomax was wearing "the hat."

Sowers could not recall how many citations he wrote in 2017, and testified he doesn't keep track of the number of citations he writes in a year.

## DISCUSSION

The Fourth Amendment secures "the right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures."  U.S. Const. amend. IV.  The Fourth Amendment protects "people, not places," and their reasonable and legitimate expectations of privacy.  *Katz v. United States*, 389 U.S. 347, 350–51 (1967).  The touchstone of the Fourth Amendment is reasonableness.  *Florida v. Jimeno*, 500 U.S. 248, 250 (1991).  Evidence obtained in violation of the Fourth Amendment, and evidence derived from it may be suppressed as the "fruit of the poisonous tree."  *Wong Sun v. United States*, 371 U.S. 471, 484–87 (1963);

14

*United States v. Lundin*, 817 F.3d 1151, 1157 (9th Cir. 2016); *United States v. McClendon*, 713 F.3d 1211, 1215 (9th Cir. 2013) ("Searches and seizures that offend the Fourth Amendment are unlawful and evidence obtained as a direct or indirect result of such invasions is considered 'fruit of the poisonous tree' and is inadmissible under the exclusionary rule.") (citing *Wong Sun*, 371 U.S. at 484–87).

I.    APPLICABLE LEGAL STANDARDS AND ANALYSIS

A.  **Request for Evidentiary Hearing**

The caption of the Motion requested an evidentiary hearing.  However, the motion itself did not provide an offer of proof or articulate any details about what Lomax expected an evidentiary hearing would establish if one was conducted.  The motion stated only that Lomax denied committing any traffic violations and that an evidentiary hearing would show he committed no traffic violations.  The court therefore set the matter for hearing on February 20, 2018.

At the February 20, 2018 hearing the court pointed out that Lomax had not made an offer of proof or indicated that he intended to testify at the evidentiary hearing that he had not committed any traffic violations.  The court inquired whether defense counsel had discussed the pros and cons of testifying at the evidentiary hearing with Lomax.  Counsel for the defense represented that these discussions had occurred, and that Lomax intended to testify at the evidentiary hearing.  Relying on these representations, the court set the matter for an evidentiary hearing on March 13, 2018, on a date and time mutually convenient to counsel for both sides.  Despite earlier representations to the court that Lomax intended to testify he declined to do so after the government rested.

A court must hold evidentiary hearing only when the moving papers allege facts with sufficient definiteness, clarity, and specificity to enable the court to conclude that relief must be granted if the facts alleged are proved.  *United States v. Cook*, 808 F.3d 1195, 1201 (9th Cir. 2015) (quoting *United States v. Howell*, 231 F.3d 615, 620 (9th Cir. 2000)).  The court need not hold a hearing on defendant's pre-trial motion "merely because a defendant wants one.  Rather, the defendant must demonstrate that a significant disputed factual issue exists such that a hearing is required."  *Howell*, 231 F.3d at 621 (internal quotation and citation omitted).  When a defendant fails to "raise a material factual dispute," no evidentiary hearing is necessary.  *Cook*, 808 F.3d at

1201.    The determination of whether an evidentiary hearing is appropriate rests in the reasoned

discretion of the district court.  *United States v. Santora*, 600 F.2d 1317, 1320 (9th Cir. 1979); *see*

*also United States v. Hoang*, 486 F.3d 1156, 1163 (9th Cir. 2007) (denial of an evidentiary hearing

is reviewed on an abuse of discretion standard). Lomax's motion did not allege facts with sufficient

definiteness, clarity, and specificity to enable the court to conclude that relief must be granted if

the facts alleged in the motion were proved.  However, the court accepted counsel's representation

that Lomax intended to testify and would establish disputed issues of fact.  In retrospect, an

evidentiary hearing was not warranted.

**B.  Lomax was not Seized Until After He Discarded the Firearm**

Lomax argues that the police conducted a traffic stop as a pretext to investigate their

unfounded suspicions of another offense or possibly to gather suspected gang affiliation

intelligence.  He argues the court should suppress the gun and money recovered following the

traffic stop and statements he made following his arrest because he committed no traffic violations

and was stopped as a pretext by gang enforcement officers looking to investigate suspected gang

activity.  His motion is supported by Ninth Circuit cases decided before the Supreme Court's

unanimous decision in *United States v. Whren*, 517 U. S. 806 (1996).  These cases have been

abrogated and effectively overruled to the extent they have held that the subjective intention of

law enforcement officers in conducting a traffic stop is constitutionality relevant under the Fourth

Amendment.

Additionally, it is undisputed that Lomax did not pull over while the officers were

attempting to conduct a traffic stop. It is undisputed that after the officers activated their lights and

sirens Lomax pulled over as if to stop but then accelerated and failed to yield to the officers'

attempt to pull him over.  Lomax eventually abandoned his vehicle and fled on foot once his car

was disabled by a flat tire. Thus the court finds that Lomax was not seized within the meaning of

the Fourth Amendment until he was taken into custody following the foot pursuit.  It is undisputed

that Officer Nameth observed Lomax pull out and discard a black framed firearm in front of the

residence around which Nameth chased Lomax.  Lomax was untouched by Officer Nameth at the

time he discarded the firearm and money.  The Supreme Court has held that a seizure does not

occur within the meaning of the Fourth Amendment when an officer makes a show of authority or commands an individual to stop, and the individual does not stop and instead flees. *California v. Hodari D, 499 U.S. 621, 626 (1991).*

As the government correctly points out *Hodari D*, 499 U.S. 621 (1991), held that an individual is not seized within the meaning of the Fourth Amendment when he flees from the police. The Supreme Court has repeatedly held that a person who does not stop when police attempt to conduct a traffic stop is not seized for purposes of the Fourth Amendment because the officer's "show of authority" did not produce his stop. *See, e.g., Brower v. Inyo County*, 489 U.S. 593, 596-7 (1989). In *Hodari D*, the juvenile defendant fled on foot after officers approached a group of juveniles in an unmarked police car. The officers were not in uniform but were wearing jackets with the word "Police" embossed on both the front and back. One officer remained in the police car while another officer pursued Hodari on foot. The officer pursuing Hodari on foot saw Hodari toss away a small rock as he was almost upon him. The officer tackled Hodari and recovered the rock which proved to be crack cocaine. Hodari filed a motion to suppress arguing he was seized in violation of the Fourth Amendment when the officers initiated their pursuit. The Supreme Court held that no seizure had occurred because Hodari did not yield to the officers' attempt to seize him, and reversed the California Appellate Court that had granted the motion to suppress.

The Supreme Court held that to constitute a seizure of the person for purposes of the Fourth Amendment, there must either be: (1) an application of physical force, however slight, by a law enforcement officer; or (2) a person must submit to an officer's show of authority restraining his liberty. *Id*. Because no physical force was applied until after Hodari tossed the cocaine, and the officer's pursuit constituted only a "show of authority" to which Hodari did not yield, the Supreme Court found Hodari was not seized until he was tackled. Thus, the cocaine abandoned while he was running was not the fruit of an unlawful search or seizure, and suppression was not warranted. Here, Lomax fled from the officers' attempt to stop him and was not touched until after he discarded the gun and the money. Thus, no seizure occurred until he gave up and was taken into

1  custody, and no Fourth Amendment violation occurred when the officers seized the abandoned

2  items.

3  **C.  Reasonable Suspicion is Required to Conduct a Traffic Stop**

4      The motion to suppress argues that the officers' decision to follow and subsequently stop

5  Lomax for alleged traffic violations "is clearly illegal and based on the fact that they thought he

6  was a gang member in a gang area."  He asks the court to consider whether if the alleged traffic

7  violations had occurred in Summerlin at the intersection of Charleston and Downtown Summerlin

8  the officers would have made the stop.  He also maintains that the test for determining whether a

9  stop violates the Fourth Amendment is whether the stop is one a reasonable officer would have

10  made absent an ulterior motive.  However, the Supreme Court's unanimous opinion in *Wren*

11  explicitly rejected this argument.  The Ninth Circuit has repeatedly recognized that under Wren, if

12  an officer has reasonable suspicion to conduct a traffic stop the stop is reasonable under the Fourth

13  Amendment "even if the ultimate charge was not related to the traffic stop" and even if the traffic

14  stop "serves some other purpose." *United States v. Willis*, 431 F 3d 709, 715 (9th Cir. 2005).

15      The Supreme Court has long recognized that the Fourth Amendment's protection against

16  unreasonable searches and seizures includes the seizure of a person.  *Henry v. United States*, 361

17  U.S. 98, 100 (1959).  A temporary detention of an individual during a traffic stop constitutes a

18  seizure within the meaning of the Fourth Amendment. *Whren v. United States*, 517 U.S. 806, 809–

19  10 (1996).  Because a traffic stop for a suspected violation of law is a seizure of the vehicle's

20  occupants, it "must be conducted in accordance with the Fourth Amendment." *Heien v. North*

21  *Carolina*, --- U.S. ----, 135 S. Ct. 530, 536 (2014).  The court has found Lomax was not seized

22  until after he gave up and was taken into custody after discarding the gun and money.  However,

23  it is clear, and the court finds, that the officers had reasonable suspicion to conduct a traffic stop.

24      The Fourth Amendment requires only reasonable suspicion to justify a traffic stop. *Id.*; *see*

25  *also United States v. Lopez-Soto*, 205 F.3d 1101, 1104 (9th Cir. 2000).  Reasonable suspicion is

26  defined as "a particularized and objective basis for suspecting the particular person stopped of

27  breaking the law."  *Heien*, 135 S. Ct. at 536 (citing *Prado Navarette v. California*, --- U.S. ----,

28  134 S. Ct. 1683, 1687–88 (2014)).  The Ninth Circuit has also defined reasonable suspicion as

"specific, articulable facts which, together with objective and reasonable inferences, form the bases for suspecting that the particular person detained is engaged in criminal activity." *Lopez-Soto*, 205 F.3d at 1105.

The reasonable suspicion standard is based on the totality of the circumstances. *United States v. Montero-Camargo*, 208 F.3d 1122, 1129 (9th Cir. 2000) (en banc); *see also United States v. Cortez*, 449 U.S. 411, 417 (1981) ("the whole picture"). This standard requires "considerably less than proof of wrongdoing by a preponderance of the evidence," and "obviously less" than is necessary for probable cause. *United States v. Sokolow*, 490 U.S. 1, 7 (1989). An officer evaluating whether reasonable suspicion is present is entitled to draw on his or her "own experience and specialized training to make inferences from and deductions about the cumulative information available." *United States v. Arvizu*, 534 U.S. 266, 273 (2002).

As long as there is an objectively reasonable basis to perform a traffic stop, the Fourth Amendment will permit the stop. *Whren*, 517 U.S. at 813. Subjective intentions play no role in ordinary Fourth Amendment analysis. *Id.* The Supreme Court has been "unwilling to entertain Fourth Amendment challenges based on the actual motivations of individual officers." *Id*. In *Whren*, a unanimous Supreme Court held that a traffic stop was reasonable under the Fourth Amendment where officers had probable cause to believe a traffic violation occurred, even if the ultimate charge was not related to the traffic stop. *Id.* at 808–09. As the Ninth Circuit has articulated its understanding of *Whren*, even reasonable suspicion of a parking violation can justify an investigatory stop of a vehicle. *United States v. Choudhry*, 461 F.3d 1097, 1101 (9th Cir. 2006).

A traffic violation is sufficient to justify an investigatory stop even if (i) the violation was merely pretextual, *Whren*, 517 U.S. at 811–12; (ii) the stop departed from the regular practice of a particular precinct, *id.* at 814–15; or (iii) the violation was common and insignificant, *id.* at 818–19. If police have reasonable suspicion to believe a violation of a traffic code has occurred, the stop is reasonable under the Fourth Amendment and evidence recovered from a stop is admissible. *Choudhry*, 461 F.3d. at 1102. As the Ninth Circuit explained, if an officer has reasonable suspicion to conduct a stop, "the stop is lawful even if the officer made the stop only because he wished to investigate a more serious offense." *United States v Magallon-Lopez*, 817 F. 3d 671, 675 (Ninth

Circuit 2016). In *Magallon-Lopez* the defendant argued that his Fourth Amendment rights were violated because the officer lied to him about the reason for the stop, and because the reason the officer gave him was not itself supported by reasonable suspicion. The Ninth Circuit rejected this argument holding the test for determining whether reasonable suspicion exists is an objective one and "does not turn either on the subjective thought processes of the officer or on whether the officer is truthful about the reason for the stop." *Id.*

The court finds that under the totality of the circumstances, the officers had at least reasonable suspicion that Lomax had committed a series of traffic violations. Specifically, the court found the officers credible that Lomax committed a violation of the Nevada traffic code by not coming to a complete stop before entering the crosswalk to make a right-hand turn on the red light. NRS 484B.307(8)(a) requires a motorist making a right-hand turn on a red light to stop before entering the crosswalk. It provides:

> Vehicular traffic facing the signal must stop before entering the crosswalk, on the nearest side of the intersection where the sign or pavement marking indicates where the stop must be made, or in the absence of any such crosswalk, sign, or marking, then before entering the intersection, and, except as otherwise provided in paragraphs (c) and (d) must remain stopped or standing until the green signal is shown.

484B.307(8)(c) permits a right-hand turn after complying with the requirement to stop before the crosswalk or marking. The court found both officers credible that they observed Lomax fail to stop behind the white marking before the crosswalk, roll into the crosswalk, and make a right-hand turn on two separate occasions.

It is also undisputed that the officers observed Lomax change lanes without signaling an intention to turn 100 feet or more before changing lanes. NRS 484B.413(2) provides:

> A signal of intention to turn right or left, or otherwise turn a vehicle from a direct course, shall be given continuously during not less than the last 100 feet traveled in a business or residential district and not less than 300 feet traveled in any other area prior to changing the course of the vehicle. This rule shall be observed, regardless of the weather.

The court also found both officers credible that they observed Lomas run a red light at the intersection of Lake Mead and D Street. Finally, it is undisputed that Lomax failed to comply with the officers' attempt to pull him over, attempted to evade the police, and abandoned his vehicle

after hitting the curb of a residential street causing a flat tire before, and then fled on foot.

## II. CONCLUSION

Whether a detention is reasonable under the Fourth Amendment "is predominantly an objective inquiry." *Indianapolis v. Edmond*, 531 U.S. 32, 47 (2000).  In this case, Lomax was not seized until he was tackled by Officer Nameth following a foot pursuit.  Before he was seized, he discarded the firearm and money he currently seeks to suppress.  Under the Supreme Court's *Hodari D.* decision suppression of the money and firearm recovered following his seizure is not required under the Fourth Amendment. The officers had reasonable suspicion to conduct a traffic stop and the Supreme Court has repeatedly held that a traffic stop or arrest does not violate the Fourth Amendment because the officers involved may have had an ulterior motive or subjective intentions to investigate another crime.

Finally, Lomax does not claim that the statements he made following his arrest for felon in possession of a firearm asking Nameth about his money were involuntary.  Rather, he seeks suppression of his statements asserting they were made following an unlawful seizure.  As Lomax was not unlawfully seized and the gun and money were not unlawfully seized, his statements may not be suppressed under the "fruit of the poisonous tree" doctrine.

For the reasons stated,

**IT IS RECOMMENDED** that Defendant Terry Lomax's Motion to Suppress Evidence and Statements (ECF No. 15) be **DENIED**.

Dated this 13th day of April, 2018.

PEGGY A. LEEN
UNITED STATES MAGISTRATE JUDGE